Shauok, J.
This is a suit to set aside a deed for ninety-six acres of land in Champaign county, executed by Thomas B. Buckles to the defendant, Margaret A. Buckles, December 31, 1880, the grounds of cancellation alleged in the petition being that at the time of the execution of the deed, the grantor was of great age, and, by reason of infirmities of body and mind, incapable of executing a valid deed; that the defendants, for the purpose of defrauding the plaintiffs and the grantor, took advantage of his infirmities, and by the exercise of undue influence over him, induced him to execute the instrument in question, without any consideration whatever, although a consideration of twenty-five hundred dollars is recited in the deed.
The answer admits the execution of the deed; denies the incapacity of the grantor, and the exercise of undue influence over him, and alleges that he was indebted to the grantee in the sum of twenty-five hundred dollars, and that the deed was executed in consideration and discharge of that indebtedness.
By reply, the indebtedness of the grantor to the grantee is ■denied, and it is alleged that the consideration, if it existed, was wholly inadequate.
An extended rehearsal of the mass of evidence submitted to us upon these issues, would be neither interesting nor profitable. It appears that the plaintiff, Elizabeth Baugh-, is the daughter of Thomas B. Buckles, the grantor; that the defendant Samuel Buckles is his son, and the defendant Margaret is the wife of Samuel. Elizabeth and Samuel are the only heirs-at-law of Thomas, who died intestate August 4, 1881, at the age of 87 years. Thomas inherited these lands, and lived upon them until his death. His wife died in 1867, at an advanced age, having been helpless for some three years before her death. The plaintiff lived at home until 1868, taking care of her mother, and performing general household duties. At that time, being then over forty years of age, she intermarried with Jacob Baugh. A few months after her marriage he removed to the home of her husband in the same vicinity, where she has ever since resided. In November, 1872, the defendants, who had for eight years resided in the State of Illinois, took up their residence at the family homestead, upon *500 an agreement, as their testimony shows, that the son was to have the entire proceeds of the farm, and in return was to support the father. The parties continued, to live together until the death of the father, in August, 1881.
In support of her averment that the deed was executed in consideration of an indebtedness of twenty-five hundred dollars, Mrs. Buckles testifies that during the nine years preceding the death of Thomas, she rendered him the constant care that was made necessary by infirmities incident to his great age, and that these services were of the value of $400.00 a year. She further testifies, although no such contract is alleged in her answer, that within a few months after their return from Illinois, Thomas told her, that if she would remain with him while he lived, he would make her a deed for the farm, and that he often repeated this promise. The evidence does not satisfy us that any such promise was ever made. It is not likely that such an arrangement, if it existed, would for nine years have been kept from the knowledge of all persons except the grantee herself. It is inconsistent with the declarations repeatedly made by the old gentleman during that time, that the premises were to be divided between his two children. It also appears by the testimony of a niece of the grantor, that in a conversation between her and the grantee, in the'presence of the grantor, about two years before his death, the grantee declared her intention of trying to persuade the old gentleman to “ make over ” to her the half of the premises that would otherwise pass to her husband, probably because of the husband’s financial embarrassments. That purpose could not have co-existed in her mind with the understanding that she was to have the entire premises.
Nor does the testimony show that the grantor was indebted to her in any sum on account of services. No express contract as the foundation for such liability is claimed to have been made. The testimony introduced by the defendants shows, that they lived with the old gentleman upon an arrangement that the son was to receive the entire proceeds of the farm, and was to support the father. That was a reasonable arrangement, and the contemporaneous acts of all the parties were consistent with it. We do not doubt that it was *501 made when the son came from Illinois, or that it continued until the father’s death. It was known by all the parties. There can be no implied promise to pay for these services, since they were, not rendered or accepted under circumstances indicating an expectation, upon the one hand to receive, or upon the other to make, compensation beyond that contemplated in the engagement between the father and the son. It seems clear that the deed is not supported by any valuable consideration.
But, certainly, it is not on that account necessarily void. Whether it is so or not, depends upon conclusions to be drawn from the remaining testimony in the case. Much testimony of but little value has been introduced upon the one and the other side touching the old gentleman’s mental condition at and about the time of the making of the deed. Most of the witnesses are without peculiar qualifications for the determination of such questions, and for the most part their testimony is made up of opinions as to his capacity without any important facts as the basis for such opinions. Dr. Deaton saw him once at about the time of the execution of this deed, and testifies, that if the condition in. which he then saw'him was fixed, it was senile imbecility. Although the old gentleman had formerly known him well as a boy in the neighborhood,’ he was unable to recall him when he gave his name, nor could he recall his father, whom he had known long and well. That this was a fixed and permanent condition, is made probable by the testimony of numerous witnesses that the old gentleman’s condition did not fluctuate — that he showed merely the gradual decline that frequently attends extreme age. On the other hand, numerous witnesses who saw him frequently, are of the opinion that he was capable of comprehending such a transaction. He transacted no business during the last nine years of his life, and these opinions are all founded upon general observations and casual conversations. The favorable opinions of some of these witnesses, rest chiefly on the fact that his conversation, while they were harvesting on the place, showed that he appreciated the difference between the present methods of cutting wheat and those in use when he was young.
*502 It seems clear that he was never a man of vigorous intellect, and at the time of this transaction his mental powers had become so feeble, that he was wholly unable to enter into a business transaction which would require him to look to his own interests, and to deal on equal terms with persons of ordinary intellectual vigor. The conclusion most favorable to his capacity that the evidence will permit, is that he might have made a valid execution of this deed, if extreme care were taken to explain to him its nature, and its effect upon himself and the members of his family.
That he who alleges fraud or undue influence, must support his allegation by proof, is a well established general proposition. Important modifications of the rule are, however, well established in equity. Although the general rule may control in determining the validity of instruments, executed by persons of full capacity under circumstances of entire independence, and although a court may hesitate to depart from it in cases showing only partial incapacity, or slight circumstances of dependence, if a full and adequate consideration shows that no undue advantage has been taken; it does not control in determining the validity of a deed executed without valuable consideration, or upon a plainly inadequate consideration, by a person partially incapaciated or dependent upon the grantee, or subject to his controlling influence. It is an object of equity to shield the infirm and dependent, and to strip the vigorous and designing of all advantage which they may acquire over them. In the pursuit of that object it will not be baffled by the fact that such advantages are usually acquired in secret, and under circumstances which make it practically impossible to produce plenary proof that fraud or undue influence has intervened. When it is made to appear that by reason of the mental weakness of one party, or the unusual influence of the other, that the parties do not deal upon equal terms, and that an advantage has been acquired, the transaction is presumed to be void, and it is incumbent upon him who asserts its validity, to show affirmatively that no artifice was practiced, no undue influence used, and that the weaker party acted voluntarily and with a full understanding of his act and its consequences. This doctrine is *503 recognized in Linus v. Tracy, 1 Ohio St. 54, and amplified in Cowel v. Cornell, 75 N. Y. 99 and 2 Pomeroy Eq. Jur. 943 et seq.
The evidence before us leaves no room to doubt, that for nine years before the execution of this deed the grantor and grantee were constant companions, he being kept at home by infirmities and she by domestic duties, she acquiring and exercising over him the influence which naturally resulted from her vigor and his dependence; that while the parties were thus situated, she acquired from him, without valuable consideration, a deed which, if valid, left him without means of support, and deprived his daughter of the rasonable expectation of sharing in his estate.
Applying to these facts the rule of equity that I have stated, it became her duty to “show affirmatively, that no deception was practiced, no undue influence used, and that all was fair, open, voluntary and well understood.” Instead of discharging that duty, she has left the entire transaction shrouded in rare and impenetrable mystery. The deed was drawn at the residence, the notary and witness having gone there from a neighboring village. The notary was sent for by the grantee. True, she testifies that the old gentleman requested her to do so; but it can scarcely be said that she maintains that position throughout her examination. The notary had been accustomed to visit the old gentleman quarterly for many years, to attend to the execution of papers necessary to collect a pension. He does not know why, or at whose request he took a blank form of deed on this occasion. After their arrival at the house, the old gentleman gave no direction whatever for the preparation of the deed. The grantee and her’ husband gave these directions, if any were then needed, and they, without request or suggestion from the grantor, produced the former deed from which the description of the premises was copied. Throughout the transaction, the old gentleman, according to all the evidence, showed no interest in it,.or knowledge that it was in progress, except that after the deed was prepared, the witness who accompanied the notary, said to him: “ Here is a deed for the place; we want you to sign it;” and that the old gentleman answered: “ I might as well do it now as any time.” He *504 then apparently acquiesced, while his hand was steadied and guided by another in making his mark.
J. K. Mower and L. Geiger, for plaintiffs.
T. J. Frank and Geo. M. Eichellberger, for defendants.
If we give the largest credit to the testimony, we cannot say that the transaction was fair, or open, or voluntary, or well understood. According to the old gentleman capacity to comprehend an explanation of the terms and effect of the instrument, none was made. If an intelligent purpose can be imputed to one in his condition thus signing an instrument, that purpose probably was to convey to her the half of the premises which, upon his death, would pass to her husband, and without any knowledge that a similar conveyance of the other half to his daughter was necessary to carry out his intention. Indeed, the evidence offered by the defendant as to the circumstances attending the execution of the deed, instead of repelling the equitable inference stated, tends strongly to confirm it. A court of equity cannot uphold a deed thus executed, without renouncing an important and beneficient portion of its jurisdiction.
The deed is set aside.